199 So. 625

Succession of BENOIT.

Opposition of BENOIT et al.

No. 35843.

Dec. 2, 1940.

Rehearing Denied Jan. 6, 1941.

Jackson & Mayer, of Shreveport, and J. Norman Coon, of Monroe, for appellants.

McHenry, Lamkin & Titche, of Monroe, for appellee.

HIGGINS, Justice.

This matter comes before us on a general opposition, which was filed by the heirs, to the testamentary executor's final account covering sixteen years of administration of the succession. The district judge, after a hearing, rejected the opponents' demand for reservation of the right to sue the executor for damages for maladministration and sustained their opposition to the executor's claims for $105 for insurance premiums, interest on money advanced, and $1,500 for attorneys' fees for filing the final account and representing the executor in connection therewith, and, as thus amended, the final account of the executor was approved and homologated and the executor discharged. The heirs have appealed and the executor has answered the appeal, asking that the judgment be amended so as to allow the attorneys' fees, the other claims having been abandoned.

Henry T. Benoit died testate on May 17, 1919, while domiciled in Ouachita Parish, Louisiana. He was survived by two sons, Harvey H. Benoit and Albert C. Benoit, issue of a previous marriage, and by Mrs. Mattie A. Benoit, widow by second marriage. He left an estate consisting principally of seventy houses in Shreveport, Caddo Parish, and twelve in the City of Monroe, Ouachita Parish, all of which belonged to the community of acquêts and gains which existed between the deceased and his first wife. The pertinent parts of his olographic will, dated May 29, 1919, read as follows:

"Subject to the payment of my honest debts I hereby leave and bequeath to my wife, Mattie Benoit, all of my personal property, including notes due me, and such stocks or bonds as I may own at the time of my death and I further leave and bequeath to my wife, Mattie Benoit, usufruct of all lots, lands houses & c situated in the City of Shreveport and Monroe La and all revenues therefrom. The expenses of collection, repairs, insurance and taxes & c to be paid from the revenues derived from the properties.

"I leave and bequeath to my friend Walter T. Cheeks, the lands bought from Tarbutton and from the state containing about 178 acres and being at the Cheniere station on V S & P Ry and whatever other lands I may have not in the City of Shreveport and Monroe La I bequeath to my sons Harvey H and Albert C Benoit, share and share alike, and at the death of my wife Mattie Benoit, at this event the property left for her use and benefit dur-

ing the rest of her life I want my sons Harvey and Albert to share equally of it. And I hereby appoint my son Albert C. Benoit, now residing in Shreveport, La. as my executor of this will, and without bond, and further in the event of my son Albert being from any cause unable to serve as executor, then and in that event I wish the Central Savings Bank & Trust Company of Monroe La to handle the estate as above outlined."

In compliance with the provisions of the will, Mrs. Mattie A. Benoit was recognized as the usufructuary of the deceased's estate until her death.

On June 6, 1919, Albert C. Benoit, one of the deceased's sons and an attorney-at-law, filed a petition in the Sixth Judicial District Court in and for the Parish of Ouachita, requesting his confirmation as the testamentary executor of the estate of his father and in due course letters of executorship were properly issued to him. The property in Caddo Parish was inventoried and appraised at $16,700, but, apparently no inventory was made of the property in Ouachita Parish. On March 15, 1920, he, as executor, was authorized by the court to deliver, in accordance with the bequest contained in the will, a particular legacy to Walter T. Cheeks. The record shows that, with the exception of the fulfillment of this bequest, no other judicial action whatsoever was taken by the executor. Upon the death of Albert C. Benoit, the executor, on February 13, 1923, the heirs did not ask for an accounting of the three and one-half years of his administration of the estate, but called upon

the Central Savings Bank and Trust Company, a banking corporation incorporated under the laws of this State and domiciled in the City of Monroe, to continue the administration under the will, and thereupon delivered all of the records and assets that had been in the possession of Albert C. Benoit to the bank. From February 13, 1923 until January 1, 1927, the bank administered the affairs of the succession, although it had not formally qualified as the executor of the estate. On January 1, 1927, it petitioned the court to be recognized as executor and letters of executorship were regularly issued to it. An inventory of the Monroe (Ouachita Parish) properties was made, which aggregated $10,900.

Albert C. Benoit, who had died on February 13, 1923, left a testament in olographic form, which was filed for probate in the First Judicial District Court of Caddo Parish on March 2, 1923. By the terms of his will, he bequeathed his entire state, including that which he had inherited from his father, Henry T. Benoit, to his widow, Mrs. Mary Tigner Benoit, in the proportion of an undivided one-half, and to his sons, Albert C. Benoit, Jr., and Harvey T. Benoit, an undivided one-fourth interest each. Mrs. Mary Tigner Benoit qualified as natural tutrix of her two minor sons, and Glen M. Walker was named as their undertutor.

On January 11, 1939, Mrs. Mattie A. Benoit, the usufructuary, died.

On June 5, 1939, Harvey H. Benoit, a resident of Monroe, La., and Mrs. Mary Tigner Benoit, Albert C. Benoit, Jr., (of lawful age) and Harvey T. Benoit (an emancipated minor), residents of Caddo Parish, filed a petition and obtained an order directing the bank, as testamentary executor, to file an account of its administration, which had not been done during the sixteen years it had acted as testamentary executor of the estate. On June 8, 1939, the bank promptly filed its final account, which covered in full and detail the entire period of its administration, and asked for its homologation. The account was divided into three divisions, the first part covering the period from August 1, 1923, to December 31, 1926, or at the time the bank administered the property without having been officially qualified as executor. The second section covers the period from January 1, 1927, to January 12, 1939, or at the time the bank was acting as the officially recognized executor, during the lifetime of the usufructuary, Mrs. Mattie A. Benoit. The third part of the account covered the period from January 12, 1939, to June 6, 1939, after the death of the usufructuary, and during which time the bank was still the official testamentary executor.

On June 12, 1939, all of the heirs filed a petition to be recognized and sent into possession of the estate of Henry T. Benoit, in the respective proportions fixed in the testaments of the deceaseds. On the same date, they asked for time to file an opposition to the final account, and on June 15, 1939, the executor answered the petition of the heirs, agreeing that they should be recognized as such and sent into possession of the estate, and also prayed for an attorney's fee of $300 for preparing the final account. There was judgment recognizing

and sending the heirs in possession of the estate. On June 21, 1939, the heirs filed a comprehensive and detailed opposition to the testamentary executor's final account, the gravamen of their complaint being that the estate did not or should not owe any debts and that on the face of the record it appeared that the executor had mismanaged the estate through negligence, indifference and incompetency, and prayed that their rights to sue for damages therefor should be reserved. On September 13, 1939, the executor asked that his final account be amended so as to allow attorneys' fees of $1,500. On September 29, 1939, the executor filed pleas of laches and estoppel to the opposition on the ground that the heirs' claims and complaints were stale, that the heirs or their representatives had, during September, 1930, settled their disputes and had subsequently knowingly and actively participated in the administration of the estate in an informal way, and had acquiesced in and condoned the method of handling their affairs and they should not now be heard to demand the forfeiture of the executor's commission, attorneys' fees, and damages for not technically following the requisites of the law in the administration of the estate.

The case was heard on its merits and the judgment from which this appeal was taken followed.

We shall first discuss the correctness of the judgment denying the heirs the reservation of the right to sue the executor for damages for maladministration consisting principally of the alleged overpayment to the usufructuary out of the rents, which were said to have decreased because it neglected to properly repair and maintain the buildings, and of the illegal use of $4,000 cash, a capital asset, in paying the usufructuary and certain other administrative bills, all of which payments were made without any order of court. Before the disputes over these matters had been finally terminated by the written agreement of September 6, 1930, and the letter of September 12, 1930, there had been considerable correspondence between the parties. We shall now consider the evidence pertinent to the issues presented covering the period of time from February 13, 1923, to September 12, 1930.

The documentary evidence consisting of letters which passed between the parties shows that the heirs were displeased and dissatisfied because the executor had paid, in monthly installments, to Mrs. Mattie A. Benoit, the usufructuary, a greater proportion of the proceeds realized from the rents than it should have and that it failed to keep the buildings in the necessary state of repair. The real estate agents who were placed in charge of the rent collections and repairs of the buildings were instructed by the executor to keep the costs of the repairs to a minimum and this policy was followed, notwithstanding the agents advised that the buildings could be more readily rented if better maintained.

With reference to the improper use of the $4,000 of capital assets, the record shows that in 1924, Mrs. Mary Tigner Benoit, individually and as natural tutrix of her two minor sons, sold to Harvey H. Benoit their interest in two lots of ground in the City

of Monroe. Harvey H. Benoit, immediately thereafter, sold the lots to the Ouachita Parish School Board for $8,000, which amount was represented by two notes of $4,000 each. Mr. Benoit delivered these notes to the executor (the bank), which collected the principal and interest thereon and subsequently purchased bonds for the benefit of the estate with this money. Some time later, upon his request, the bank sold half of the bonds and the sum of $4,000, which was realized therefrom, was delivered to him, with the consent of the usufructuary. Thereafter, the bank also sold the remaining bonds for $4,000 and placed the proceeds in the general fund of the estate. The bonds had been purchased at par with accrued interest and were likewise sold. Later, the bank used the major portion of the $4,000 derived from the sale of the bonds to pay the monthly installments to the usufructuary, as well as certain other items of expense.

In February, 1930, Mrs. Mary Tigner Benoit, through her representative and attorney, contended that she was entitled to receive, individually and as the tutrix of her children, the sum of $4,000, to equalize the payment made to Harvey H. Benoit. The matter was fully discussed by Mrs. Mary Tigner Benoit, Harvey H. Benoit, the bank, as executor, Mrs. Mattie Benoit, the usufructuary, and the attorneys for the respective parties, and the entire affairs of the succession were thoroughly aired and a full accounting, in writing, was furnished by the bank, as executor, to all of the interested parties. In the notarial act dated September 6, 1930, Mrs. Mattie Benoit, as usufructuary, waived her rights as such against future rentals until the sum of $4,000 had been paid to Mrs. Mary Tigner Benoit in monthly installments. In the letter of September 12, 1930, in which it was agreed that Harvey H. Benoit would retain the $4,000 he had received and that the bank should continue its administration and pay from the rents collected the sum of $4,000 to Mrs. Mary Tigner Benoit, the bank stated: "This undertaking, of course, is based upon * * * the heirs' agreement to the continuance of our administration. * * *" It was also agreed that the buildings would be well repaired. Communications between the interested parties, their representatives and relatives, subsequent to the date of the agreement, also verify the understanding between the parties, and from that time until 1934, Mrs. Mary Tigner Benoit, individually and as natural tutrix, received from the executor a check practically each month covering the proceeds of the monthly rentals, until the sum of $4,000 was paid in full. The Shreveport houses were satisfactorily repaired under the supervision of R. L. Butler, a relative of the heirs. The bank has pleaded estoppel by acquiescence, and settlement with full knowledge of all of the controversial matters between the parties up to that time, but counsel for the heirs contend that in this settlement there was not any express waiver of the heirs' rights to claim damages for the maladministration, in the overpayment to the usufructuary and in the unauthorized and illegal handling of the capital assets of $4,000, which resulted in a lack of funds for the maintenance and repair of the properties.

The testimony as well as the evidence shows that there was no misunderstanding between the parties or lack of proper knowledge or misrepresentation by any of them in confecting the agreement to settle the matters in dispute. Harvey H. Benoit and Mrs. Mary Tigner Benoit (individually and as natural tutrix) have each retained the $4,000 which they received from the sale of the bonds and have not offered to return the whole or any part thereof. After the notarial agreement of September, 1930, wherein Mrs. Mattie A. Benoit waived her rights as usufructuary until the $4,000 was paid to Mrs. Mary Tigner Benoit out of the rent collections, which sharply declined thereafter, Mrs. Mattie A. Benoit (whose death occurred in 1939) did not receive any portion of the rents. The widow as usufructuary from August, 1923, to September, 1930, received from the bank or the estate the sum of $15,000, or $2,143 per year, or $178.90 per month. This is said to be overpayment to her to the detriment of the estate of which the heirs held the naked ownership, but if that be so, it happened before the agreement was entered into and cognizance thereof was taken by the claimants. The heirs cannot retain the benefits and advantages of that agreement and repudiate the portion thereof that bound them for it settled the conflicting claims. Even if the bank's administration was faulty and subject to legal correction on the demands of the heirs, the affairs of the estate up to September, 1930, were amicably settled by the parties themselves and the heirs are now estopped and barred from attempting to renew those matters. Jackson et al. v. United Gas Public Service Company et al., 196 La.

1, 198 So. 633, on rehearing; Mims v. Sample, 191 La. 677, 186 So. 66.

Were there any acts of mismanagement from 1930 to 1939 which would justify the court in reserving the heirs the right to institute an action against the executor for damages?

At all times following the 1930 agreement Harvey H. Benoit, one of the heirs and opponents herein, had actual charge of the administration of the properties, the collection of rents, the employment of collectors and the making of repairs in connection with the Monroe properties. The checks, letters and other documentary evidence, as well as the testimony, reveal that he was a well-informed and experienced business man and the executor gave him full run in the handling of the Monroe properties, but in spite of his best efforts the rents there gradually declined, although these houses were not the cheap Negro type of rental properties which formed the bulk of the Shreveport houses. Therefore, there can be no doubt that the Monroe properties were placed in competent hands and that they were not neglected from the standpoint of repairs or collections. The regular rental reports by Mr. Benoit, written on the Benoit-Nash Motor Company Inc.'s stationery beginning with the year 1930 through 1939, are in the record and establish the fact that the proper attention was paid to his work.

The photographs in the record prove that a great number of the seventy houses in Shreveport were cheaply constructed Negro dwellings; that they were erected in 1917 by Henry T. Benoit, the deceased; and

that they were small frame or "shot gun" buildings with concrete blocks for pillar foundations and composition roofs. Mr. Russel P. Moore who acted as rent collector complained as early as 1923 that these buildings required constant repairs to keep them habitable. It appears that he (Russell P. Moore) collected rents for Albert C. Benoit during his executorship, and that he continued to act in that capacity from 1923, after the bank took charge of the estate, until his death in 1928.

Glen M. Walker, undertutor of the minors, a brother-in-law of Mrs. Mary Tigner Benoit and the insurance agent who attended to the insurance coverage of the entire properties, recommended J. T. Hawkins to succeed Mr. Moore, as a competent and reliable real estate operator. Mr. Hawkins acted until the latter part of 1929, when Mr. R. L. Butler, a son of Mrs. Mattie A. Benoit, the usufructuary, and step-brother of Harvey H. Benoit and step brother-in-law of Mrs. Mary Tigner Benoit, was appointed by the bank, upon the recommendation of the family. He had charge of the properties until the close of 1930 and effected extensive repairs on the buildings under the agreement between the parties of September, 1930. The repairs were made to the composition roofs, the gas and water pipes which had rusted out and certain wood work in both the interiors and exteriors of the buildings. When Mr. Butler expressed the wish to be relieved of his responsibility, the bank again consulted with Glen M. Walker and J. T. Tigner and they recommended M. H. Polk, who took charge of the collection of the rents in 1931. Mr. Polk

acted until March 1935, when he was replaced by J. T. Tigner, Mrs. Mary Tigner Benoit's brother, who was recommended by Harvey H. Benoit. Mr. Tigner had a Mr. Powell and W. B. Powers, at different times, to assist him, and towards the latter part of his activity, Mr. Powell began to make the remittances direct to the bank instead of through Mr. Tigner. On December 22, 1930, J. T. Tigner and Glen M. Walker wrote a letter to the bank, the pertinent part of which reads as follows:

"On yesterday we made an inspection of all of the Benoit houses in Shreveport * * *. with the exception of three houses, all were found in fair repair with evidence that considerable repairs have been made on a majority of the houses * * * In conclusion, we will say that we strongly recommend that you secure a new agent in Shreveport with as little delay as possible * * * We have made an investigation of Mr. M. H. Polk * * * and we are of the opinion that you will find him very satisfactory. In fact, we believe that he will be found as satisfactory as your former agent, Mr. Russell P. Moore."

On March 16, 1931, the bank had a written memorandum of a report by Harvey H. Benoit reading as follows: "H. H. Benoit brought in Monroe Feby Rents today. * * H H B seemed in better humor. Says collections in Monroe * * * both for Benoit Estate and himself personal are very slow and that he has made the rounds and the renters 'just haven't got it.'"

On November 17, 1934, the bank received a letter from Mr. Polk, the relevant part of which reads: "* * * Mr. (J.

T.) Tigner is a brother-in-law (as a matter of fact Mr. Tigner is a brother rather than a brother-in-law) of Mrs. Albert Benoit (Mrs. Mary Tigner Benoit, widow of Albert C. Benoit) * * * and both Mr. (H. H.) Benoit and Mrs. Albert Benoit asked that we notify you to report to Mr. Tigner so that he may personally inspect the properties when repairs are made, approve expenditures made on same and see after his sister-in-law's interest. Mr. Tigner in turn will forward the reports to us." (Parenthesis Ours.)

On January 18, 1935, Harvey H. Benoit wrote to the bank enclosing the Shreveport rent check for December, 1934, stating, in part: "* * * Mr. Tigner is retaining the detail account until such a time as he can go over same with Mr. Polk."

On March 28, 1935, Mr. Polk wrote the bank, in part, as follows: "* * * Mr. J. T. Tigner * * * has informed us that after April 1st, he will take charge of collections for the H. T. Benoit estate * *." The bank, on April 3, 1935, replied: "* * We will state that we had nothing to do with these arrangements, but, as Mr. Tigner is related to Mrs. Albert Benoit (Mrs. Mary Tigner Benoit), who owns one half interest in this property, and has also explained the matter fully to Mr. Harvey Benoit, the other owner, the matter of him handling the rentals in future will, of course, be satisfactory to us." Mr. Polk's last collection was reported in a letter by him to the bank dated April 1, 1935, in which he stated: "* * * We made our final collection Sunday, March 31st, 1935 * * * we are turning this account over

to Mr. J. T. Tigner as he directed us to do."

There are a great many other letters and documents in the record as well as testimony, which show that the heirs or their representatives were fully cognizant of the manner in which the property was being handled in Shreveport and of the steady decline in the rentals and revenues therefrom. There is no doubt that each of the parties who were recommended and selected to handle the Shreveport properties were experienced and diligent in discharging their duties. In spite of the fact that Mr. Walker highly recommended Mr. Polk as "one who might be found as satisfactory as your former agent, Mr. Russell P. Moore * * *," the rentals dropped from approximately $600 to $300 per month during Mr. Moore's handling of the collections from 1923 to 1928 and this, it will be noted, was before the depression began. Mr. Moore was confronted with the necessity of having a railroad fence constructed which closed one means of entry to the Negro properties or "Jones Quarters," in addition to the fact that these cheaply constructed houses had become uninviting for there were inadequate toilet facilities, etc. Notwithstanding the concerted efforts of the heirs, their representatives, the bank and the other parties selected to handle the Shreveport rentals and collections, they were equally unsuccessful in stemming the tide of the declining rents. There is no doubt that the consequences resulting from the general depression and the unemployment situation primarily caused the unfavorable outcome of the executor's

administration, and, therefore, the bank is not responsible therefor, since the law only requires that it shall act as a prudent administrator. Art. 1147, R.C.C. See, also, Art. 567, R.C.C.

On December 18, 1930, Glen M. Walker wrote the bank in part as follows: " * * * It is true, the unemployment situation is very acute in Shreveport, but I doubt very much the statement that other owners of negro rent property are only collecting 40% on their occupied houses."

On January 22, 1931, R. L. Butler wrote the bank with reference to low rentals, as follows: " * * * This scheme (to reduce the rent per house and to raise the volume) proved to be alright, but the negroes no doubt have taken advantage of the depression and just wont pay up. I have made these negroes move until the Chief of Police of Shreveport told me that he was not going to make any more negroes move that was out of work."

On July 5, 1935, J. T. Tigner wrote to Harvey H. Benoit, as follows: " * * * This property must be effected (*affected*) with jinks or spooks, as well as the biggest bunch of thieves that those sorry roofs will cover." (Italics ours.)

Repeated complaints were also made that negro tenants were stealing faucets and other fixtures that could be easily removed and in order to overcome this, one tenant was permitted to remain on the property rent free to act as a guard or watchman.

On January 10, 1936, Mr. Tigner again wrote Mr. Benoit, as follows: " * * * As I wrote you last week you will have to get some one else to look after it. You can see from the statement there is not much difference in the receipts, and the improvements not much better in the past year. * * * The water bill seems to be reduced temporarily. It will break loose some where else when you least expect it * * *."

Mr. W. R. McWilliams, Secretary of the Monroe Building and Loan Association, testified that his association owned and rented a considerable number of houses to colored and white tenants; that the revenues therefrom declined substantially between the years of 1929 and 1936, due to the depression and the unemployment situation; that many of the houses remained unoccupied; that although the rent charged per house was decreased, much of it was uncollectible; that the Negro properties, being of cheap construction, deteriorated quickly, particularly when unoccupied; and that when the cheap Negro houses were not producing sufficient rent, the owner was compelled to forego the proper maintenance and repairs thereon.

█ In order to show mismanagement of the Shreveport properties, the able counsel for the heirs have argued that the overpayment to the usufructuary from 1923 to 1930 and the improper use of the capital assets of $4,000 are the real causes of the loss of revenues and rents and the fact that the properties were not properly maintained and repaired. As we have already stated, this matter was closed in 1930 by agreement between the parties and it certainly cannot now be a predicate for an action for damages for the alleged negli-

gent management of the properties said to have taken place subsequent thereto.

■ It is our opinion that the testimony as well as the documentary evidence in this case preponderates in favor of the bank as executor that it was not guilty of any maladministration through neglect, indifference or carelessness in the management of the estate and, therefore, the trial judge properly refused to reserve the heirs the right to institute a suit for damages therefor, particularly when it is shown that the heirs and their representatives participated in the management of the estate or assisted in the selection of those who were placed in charge of the administration of the properties. Succession of Stille, 52 La. Ann. 1538, 27 So. 954; Succession of Myrick, 38 La.Ann. 611; Succession of Rhodes, 164 La. 488, 114 So. 107; Leigh v. Wright, 183 La. 765, 164 So. 794; Leigh v. Wright, 192 La. 224, 187 So. 649.

■ With reference to the complaint that the trial judge improperly allowed the executor's commission, in view of the foregoing conclusions which we have reached, it now appears that the only negligence that the bank was guilty of is that it failed to secure the court's approval for various actions taken by it in paying certain bills (in which some of the heirs or their representatives joined) and that it did not annually file an account of its administration. However, it was shown that while no formal account was ever rendered by the bank, whenever any of the heirs or interested parties desired an account of the administration, the bank quickly furnished it and on a number of occasions the request was for an accounting going back over a great many years, or practically over the entire period of the bank's administration of the estate. Apparently this is the manner in which the succession was handled from the beginning, for there was no account rendered by Albert C. Benoit in court of his administration of the estate during the three and one-half years in which he served as executor. The heirs had the right to compel the executor to file an annual account. R. C. C., arts. 1191, 1674, and Code of Practice, art. 997. They also had the right to terminate the executor's administration at any time they desired to do so. R. C. C., arts. 1012, 1671, and Code of Practice, arts. 1000, 1001, and 1003.

The bank's fee, as executor, amounted to $2,172.20, which averaged about $12 per month during the sixteen years that it administered the estate. The formal account was filed with the court, in compliance with the judicial demands of the heirs. The bank properly accounted for all assets and expenditures and there was no charge of fraud, or dishonesty, or any evidence to that effect, nor was it shown that any claims which were paid were not justly due, except that the trial judge rejected the claims of the executor for interest on certain advances made by the bank to the estate and for an insurance premium of $105, which claims the bank has abandoned. Under these circumstances, we see no reason to differ with the trial court in allowing the executor's fee. Succession of Gandolfo, 173 La. 190, 136 So. 561, 83 A.L. R. 720; Succession of Rhodes, 164 La.

488, 114 So. 107; Congregation v. Farrelly, 34 La.Ann. 533.

■ The executor answered the appeal and asked that the judgment be amended so as to allow a reasonable attorneys' fee of $1,500 for representing the executor in connection with the account, the opposition thereto, and this litigation generally. As we have already stated, the bank received an executor's fee of $2,172.20 or $135.76 per year or less than $12 per month, which is certainly not adequate to take care of that institution's actual cost in having its representatives attend to the administration of the estate and to keep the proper accounts. The bank asked for a fee of $50 in connection with the filing of the final account and later revised the figure to the sum of $300, and subsequently asked for $1,500. The record shows that the heirs or any interested parties, upon request, were promptly furnished with a complete statement of all assets and of the expenditures of the administration and that during its entire sixteen years of management of the estate, no request was made to have a formal account filed in court. The judicial demand in the instant case was for an account covering the sixteen years that the bank was in charge of the administration of the estate. There was no complaint or protest during all that time that the bank failed to file a formal account annually, in court, the parties appearing to have acquiesced in the informal way of having the bank account to them. In any event, it was

necessary for the bank to have an attorney to represent it in presenting the final account and attending to the litigation which resulted from the opposition thereto. Under the circumstances, we think that an attorneys' fee should have been allowed and that the sum of $300. is sufficient to cover the same. See Succession of Gandolfo, supra.

■ The heirs also complained about the trial judge allowing the interest and penalties and advertising costs in connection with delinquent taxes and also interest on certain paving charges. The record shows that there was no available proceeds from the rents collected to promptly take care of these debts and at the same time keep the agreement with Mrs. Mary Tigner Benoit to pay the $4,000 cash in accordance with the September, 1930, agreement and to also make the repairs necessary to keep the dwellings habitable. The heirs were apprised of this situation. Our learned brother below properly allowed these items.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment of the district court be and the same is hereby amended so as to allow the attorneys for the executor, the Central Savings Bank & Trust Company, the sum of $300 as their fee, and, as thus amended, the judgment is affirmed at the appellants' costs.

LAND and FOURNET, JJ., absent.