35 So.2d 465

Succession of DAVID.

WIMBERLY v. DAVID et al.

No. 38074.

April 26, 1948.

C. F. Boagni, Jr., of Opelousas, for defendants and appellants.

N. S. Hoffpauir, J. Donald Aaron, and H. Purvis Carmouche, all of Crowley, for administrator, plaintiff, and appellee.

FOURNET, Justice.

Joseph C. Wimberly, who was appointed and qualified as the administrator of the succession of Homer David on April 27, 1922, filed an account of his administration on April 7, 1938, after having been ordered to do so by the court upon the motion of some of the heirs. The movers opposed this account, challenging, in effect, each and every item and requiring strict proof. They are now appealing from a judgment of the lower court dismissing their demands and approving and homologating the account.

The record shows that Homer David died intestate in Acadia Parish on March 30, 1922, leaving his widow, six children, and eight minor grandchildren (children of a predeceased daughter by her marriage to Ignace Guidry). His estate was so involved that neither the widow nor any of the children, all majors at the time, were willing to accept the succession. On April 11 following, at the urgent request of all of the heirs (the grandchildren being represented by their father and legal tutor), Joseph C. Wimberly, the husband of Dora David, one of the daughters, applied for appointment as the administrator of the succession. An inventory and appraisal disclosed that the estate consisted of movable property valued at $7,416 and immovables valued at $15,320, or a total of $22,736. In July of 1925, in accordance with authorization obtained from the court and after due advertisement, the administrator sold at public auction at the home of the deceased certain movable and immovable property of the estate, recording a procès verbal thereof. At the time this authority was obtained, a new inventory and appraisal was made at the request of the administrator and it showed the value of the property sought to be sold to be $13,473.50. The procès verbal of the sale shows this property brought $20,569 at public auction. A large crude oil engine that had been used in connection with the irrigation of the property had previously been sold for $2,927.81, all of the heirs signing the act of sale, including the minors through their tutor.

On March 23, 1938, approximately 16 years after the death of Homer David and 13 years after the sale of this property, ten grandchildren (seven children of the deceased's only son, Wilfrey David, and three children of Ignace Guidry) and one daughter (Elmire David Thibodaux, admittedly incompetent at the time the account was

demanded and judicially interdicted immediately thereafter) moved to have Wimberly show cause why he should not file an account of his administration and produce his official bank book showing the funds collected and deposited to the account of the estate, in default thereof, why he should not be dismissed from office and condemned to pay the statutory penalties provided upon the funds collected and not deposited. In response to this rule the administrator filed an account wherein he listed in detail the funds received from the estate (amounting to $27,017.50) and his liquidation of the succession debts (amounting to $29,119.46), the unpaid balance shown thereon ($1,041) constituting the costs incidental to the administration. The account also showed that there remained undisposed of a tract of land valued at $60, unsalable farm equipment (valued at approximately $600 in 1922), and worthless corporate stocks and promissory notes. He explained that his failure to account was due to ignorance rather than avoidance of duty, he being unaware an accounting was required when there were no funds left in the estate after all the debts had been paid. He was unable to produce all of his records for a great many of them were lost, mislaid, or destroyed when the Commercial Trust and Savings Bank of Church Point, Louisiana, the officially chartered state bank in the parish in which he had deposited the succession funds, was merged with the Farmers Bank & Trust Company in 1927. He asked that notice of the filing of the account be given to the heirs not already parties to the suit.

In a lengthy and involved opposition (obviously filed, as the trial judge points out, as a mere inquiry and investigation without any knowledge of the facts), filed by all of the parties who had demanded the accounting (Elmire David Thibodaux represented this time by her daughter, Alice Thibodaux Daigle, her legal curatrix), each and every item purporting to be a debt of the succession was challenged. In addition, the opponents contended (1) that the debts incurred in the farming operations conducted on the property during the interval between the death of Homer David and the sale of his property were not for the benefit of the succession but for the benefit of the administrator personally, and that he should be made to pay an annual rental of $3,000 for three years in compensation for the unauthorized farming operations he conducted on the property; (2) that the administrator should be condemned to pay the penalties provided for in Article 1150 of the Revised Civil Code (i. e., 20% annually) because of his failure to deposit funds belonging to the estate in a chartered bank in the parish and his disbursement of them without court order; (3) that the account fails to include a 12-acre tract of land; and (4) that the account was not complete since it did not include detailed information about the crops raised on the property other than rice.

Four of the remaining Guidry children answered the notices served on them, adopting the pleadings of the opponents, while the other living daughters of the deceased (Hermina D. Barousse, Jr., Ellina D. McBride, Dora D. Wimberly, and Zoe D. Higginbotham) and the remaining Guidry child (Austin J. Guidry) joined the administrator, approving his account and its homologation.

Although this case was tried on the merits on the issues thus presented in September of 1939 and was to be submitted on briefs within the delays fixed by the court, it was not until after the judge had ruled the attorneys in the case on December 24, 1943, to show cause why the matter of the approval and homologation of the account should not be submitted on briefs, and numerous extensions of time had been granted by the court, that judgment was finally rendered on May 31, 1945, dismissing the opposition, approving the account and ordering it homologated, and cancelling the administrator's bond.

It is most important to a proper decision in this case that the events leading up to and surrounding the administration of this succession be thoroughly understood. The picture we find reflected by the record is as follows:

Around 1917 or 1918 Homer David and his son-in-law, Ignace Guidry, undertook the cultivation of rice on a partnership basis, David furnishing the land and Guidry being largely responsible for the farming operations. Shortly thereafter the country entered the depression era that followed in the wake of the First World War, when most things, particularly farm property and products, were of precarious value. In 1920 the bottom dropped out of the rice market. Rice, that had been sold for $15 a sack early in 1920, brought only $1 a sack in the fall of that year. In 192₁, being unable to meet pressing obligations, the partnership was dissolved, and David was left with the job of harvesting the crop and liquidating the debts. Stamm-Scheele Manufacturing Company, Ltd., was then threatening to foreclose on the $4,000 solidary note given them on March 3, 1920, by David and Guidry to secure payment of the 100 Horse Power Giant Fuel Oil Engine and other property vitally needed in rice farming operations, including a pulley, water circulating pump and tank, storage tank, wagon tank, and all fittings. In the meanwhile, David, who was the president of the Farmers Union Gin Company, Inc., and the owner of a large block of its stock, had personally assumed a number of the obligations of that corporation to prevent the seizure and sale of its property and had, besides, endorsed notes of a number of his relatives. In an effort to secure funds to harvest the standing crop and to liquidate some of the more pressing obligations, David, on July 11, 1921, borrowed $6,500 from the Mortgage Securities Company of New Orleans, securing the loan with a

mortgage covering the four tracts of land comprising the 243.21 acres on which the principal rice farming was done. On the same day he also borrowed an additional sum of $975 from this company and secured it with a second mortgage on this property. Conditions grew worse. In the early part of 1922 David began to worry about planting operations, being unable to work the property himself and being without the necessary funds. On February 16, 1922, he borrowed $4,323.25 from the Commercial Trust and Savings Bank, securing this loan with the other four tracts of property owned by him that were of any consequence, although at that time he was deeply in debt to this bank on unsecured paper, including a solidary note for $1,155 given the bank on June 10, 1921. Upon the advice of his son-in-law Wimberly (the administrator), David employed Robert Rayon to take over the farming operations on a tenant-sharecrop basis, agreeing to furnish the water (by operating the irrigating well and pumping equipment), sacks for the rice, hauling, threshing, and storage. Almost immediately thereafter—on March 30, 1922—Homer David died. The estate being so obviously involved, none of the heirs were willing to take charge of the succession and administer it. They prevailed upon Wimberly to salvage what he could out of the wreck, having faith in his integrity and in his ability in agricultural pursuits. He sought to carry out these duties to the best of his ability and in good faith, though largely without court order.

Wimberly naturally had no choice but to carry out the contract David had entered into with Rayon; besides, he and the heirs felt real estate values were so uncertain that it would be unwise to put the property on the market at that time. Under his personal supervision the property was farmed during 1922 and resulted in a profit to the estate of $1,415.17, after all expenses were deducted. However, in view of the then prevailing conditions, Wimberly thought it best not to attempt to work the property again in 1923, particularly since pressing debts could not be paid and he had no operating capital. It was only at the insistence of the heirs, and after Mrs. Homer David, the widow, offered to secure a loan of $3,000 from the Federal Land Bank in her own name to tide the estate over until it could be more profitably liquidated, that Wimberly agreed to again let the property out to tenants and to supervise their operations. The profit realized in 1923 amounted to $554.10. His operations the following year (when the profit was $105) were only undertaken after he had explained the conditions to the heirs and had received their approval. In 1925, after the crop had been planted, Wimberly found himself forced to petition the court for authority to sell the property of the decedent in order to raise sufficient funds to pay pressing creditors of the estate with whom no settlement had as then been made. At that time the property sought to be sold was appraised at $13,473.50 and the procès verbal of the sale discloses that it brought $20,-

569 at public auction, the widow of the deceased acquiring two of the tracts involved, the largest tract (consisting of 200 acres with irrigating well and pit and gas engine) being sold for $15,600, $9,498.09 in cash, and the balance by the assumption of the mortgages against the property held by the Mortgage Securities Company. Following this sale, the administrator paid all of the debts of the estate.

It might be well to observe here that the funds were insufficient to liquidate all of the debts and the administrator personally made up the deficit. The only debts that remain due and unpaid today, according to his account, are those that were incidental to the administration, that is, the administrator's fee, attorney fees incurred in filing the account, and court costs.

It might also be well to observe that the fathers of the opponents here, Wilfrey. David and Ignace Guidry, were largely responsible for the insolvent condition of the deceased's estate, since it appears that in addition to the large indebtedness resulting from the joint farming venture undertaken with Guidry, the deceased bound himself personally on many other obligations of these two men and they were, additionally, the chief beneficiaries of the worthless notes forming a part of the succession. Further, it appears that Wilfrey David was weak, both mentally and physically, and was cared for (as was also his large family, including seven of the opponents here) almost entirely by the deceased during his lifetime; that Mrs. Elmire David Thibodaux, another of the opponents, was a similar charge of her father; that one of the tenant farmers on the property of the estate during 1923 and 1924 was Mrs. Thibodaux's son-in-law, the husband of her curatrix; and that Mrs. Wilfrey David and her children farmed on this property during the entire time it was under administration.

There can be no question but that the administrator, though lacking the technical knowledge of the legal requirements attendant upon the administration of successions, attacked the thankless job thrust upon him with the earnestness and zeal he would have applied to his own property, and that in all he did he had the full knowledge and support of the heirs, as well as their consent and acquiescence, the minors being represented by their legal tutor. This is unmistakably evidenced by the action of the only living daughters and heirs who were capable of handling their own affairs in joining the administrator and approving the homologation of his account. The only other parties at interest who could attest to their approval of his actions are now dead: Ignace Guidry died around 1928 or 1929, Wilfrey David died in 1936, and Mrs. Homer David, the widow, died in 1937. His final account is not only full and complete in every detail, but each and every item thereon is amply supported by competent evidence. The entire record reflects that Wimberly was possessed of an earnest

and honest desire to salvage something from the estate for the creditors and heirs and that all of his efforts were exerted toward that end.

This was also the conclusion of the trial judge, for in his written reasons for judgment he says: " * * * he was not a bad or inattentive gestor of the estate's affairs, but on the contrary, administered the estate as well as he would his own affairs; * * * his final account, though tardily rendered, is complete in every respect, and shows on its face a detailed statement of all revenues he received from farm rents and crops, less expenses incurred, during the year 1922, 1923, and 1924, and the proceeds from all the private sales he made of movable property, and those he realized from the public sale he made under an order of court of date July 11, 1925, and a list of a few items of property remaining unsold. * * * There is not a scintilla of evidence to show maladministration or personal enrichment by the administrator * * * . After carefully reviewing the entire record in this involved succession * * * it is the opinion of this Court that the opponents have absolutely failed in establishing by proof any material allegation in their opposition; * * * that no loss to the creditors and/or the heirs was shown, and that under the explanations made concerning the conduct of the administrator in his liquidation of this insolvent and involved succession, there was no maladministration nor malfeasance in office * * *."

We therefore conclude that under the provisions of Article 1150 of the Revised Civil Code, as modified by our jurisprudence, the enforcement of the penalties provided for the failure of an administrator to deposit funds of the succession, disburse them without court order, and tardily account, lies within the sound discretion of the court, and where it is found that the faults of the administrator do not amount to malfeasance, but result, rather, from errors of judgment, we will not disturb these findings, particularly when all of the heirs tacitly joined him in all that he did and no loss to either them or the creditors was occasioned by his administration. See, Congregation of St. Mary of Mount Carmel Church v. Farrelly, 34 La.Ann. 533; Succession of Myrick, 38 La.Ann. 611; Succession of Barrett, 43 La.Ann. 61, 8 So. 438; Succession of Stille, 52 La.Ann. 1538, 27 So. 954; Succession of Bertrand, 127 La. 857, 54 So. 127; Succession of Rhodes, 164 La. 488, 114 So. 107; Succession of Gandolfo, 173 La. 190, 136 So. 561, 83 A.L. R. 720; and Succession of Benoit, 196 La. 509, 199 So. 625.

For the reasons assigned, the judgment appealed from is affirmed.

O'NIELL, C. J., does not take part.