**64 So.2d 428**

**Succession of BARONET.**

**Opposition of AUBÉ.**

**No. 37936.**

March 23, 1953.

Edward F. LeBlanc and John Nugier, Abbeville, for appellant.

Jas. A. Gremillion, Baton Rouge, L. J. Mayeux, Crowley and A. C. Chappuis, Rayne, for appellees.

FOURNET, Chief Justice.

August Baronet, who was appointed and qualified as the administrator of the succession of Jules Baronet, Sr. on June 18, 1930, filed an account of his administration on May 9, 1938, after having been ordered to do so by the court upon the motion of one of the heirs. The mover, Lovenia Baronet Aubé, opposed this account—challenging each and every item, alleging various irregularities, charging that the assets of the estate had been dissipated and employed for illegal purposes, and praying that the Administrator and the surety on his bond be jointly and severally condemned to pay the penalties provided by law. She is now appealing from a judgment of the lower court dismissing her demands and approving and homologating the account.

The record shows that Jules Baronet, Sr., died intestate in Acadia Parish on May 21, 1930, leaving as heirs nine children and one grandchild (child of a predeceased son), all majors or emancipated by marriage. His estate consisted of separate property, movable and immovable, in Acadia and Vermilion Parishes (the marriage to his former wife having been dissolved by divorce in 1923, when a final partition of the community was made), and included two farms, each with an irrigation well and pumping plant, devoted to the raising of rice and cotton. It was necessary that someone immediately take these properties in hand in order to provide water for the growing rice crops, under existing agreements with the tenant-lessees; and pursuant to application filed on May 26, 1930, August Baronet, one of the sons of the deceased, was appointed and qualified as administrator without opposition. An inventory and appraisal disclosed that the estate in Vermilion Parish consisted of a farm of 702 acres valued at $21,078.60; in Acadia Parish it consisted of a 720-acre farm ($48,194.75), eight town lots with warehouse situated thereon in Rayne ($2,-500), and the home residence in South Crowley located on three and a half city blocks ($3,500), these immovables being valued at a total of $54,194.75; as well as movable property (farm implements, a truck, an automobile, some cattle and mules, equity in rice and cotton crops for 1930, two shares of stock in the Rayne State Bank, and cash) valued at $3,864.22. The combined inventories amounted to a total of $79,137.57, but failed to reflect that all of the immovable property, with the exception of the home place at Crowley, was heavily encumbered with mortgages placed thereon at various times by the decedent.

It was the plan of the heirs to wind up the estate within a period of nine months by converting the land and water rentals for 1930 (represented by shares of the crops) into cash, selling the movable property and all of the immovable property with

the exception of the Acadia Parish farm; and with the proceeds, estimated at $18,864 after payment of mortgage indebtedness on the lands sold, to apply $9,000 to payment of unsecured creditors, legal fees, costs and other expenses, and the balance of $9,864 as a credit on the mortgage resting on the Acadia farm, which land would subsequently be divided among the heirs, each to place a mortgage on the share received by him or her to clear the land of the remaining indebtedness under the existing mortgage. On this representation to the Court, attached to which was a detailed and itemized statement of the probable cash to be handled by the administrator ($18,864), August Baronet in his petition for appointment sought a reduction in the amount of bond to be furnished, which bond was then set by the Court at $25,000.

At the time of decedent's death, his cash assets amounted to only $94.22. Shortly after appointment the Administrator sought and obtained from the Court authority to borrow from the Rayne State Bank $2,000, "to pay all bills and accounts out of the proceeds," and to execute as security a crop lien, payable December 1, 1930, on the crop shares due as land and water rental from the farms, alleging that there were certain listed bills and funeral expenses of the deceased to be paid, as well as current and anticipated expenses incidental to the operation and maintenance of the irrigation plants. Of this amount, the Administrator borrowed a total of $1,250, which was shortly repaid; the balance of the authorized loan was not used. Again, on January 21, 1931, he sought and obtained from the Court authority to sell, after due and legal advertisement, the two shares of Rayne State Bank stock and the South Crowley property, with buildings and improvements thereon, "to realize sufficient funds to pay some of the ordinary and privileged debts of the deceased and charges of his succession." The stock was sold and the proceeds deposited in the bank, but the South Crowley property was not sold.

The plan to sell the immovable property did not materialize, and the Administrator leased portions of the farm lands for the year 1931 on a share-crop basis. Reciting these facts, he petitioned the Court, in June, 1931, for authority to execute a crop lien in favor of the Rayne State Bank, in amount of $3,750, payable November 1, 1931, to defray the expenses incidental to furnishing water, also for making necessary repairs on the engines and machinery of the pumping plants. Of this amount a total of $1,650 was borrowed, and was timely repaid.

The early part of 1932 saw foreclosure proceedings on the mortgages affecting three of the four pieces of immovable property. In January, the Rayne State Bank instituted foreclosure proceedings on its $8,000 mortgage, executed by the deceased in 1921, bearing on the eight lots and warehouse in Rayne, and this property was adjudicated to the Bank for $1,734. In February, the Prudential Insurance

Company, which held a $15,000 mortgage executed by the deceased in 1926 on the farm in Vermilion Parish, foreclosed and became the adjudicatee for $1,000, leaving a large deficiency claim. And in May, the Federal Land Bank foreclosed its first mortgage on the Acadia Parish farm, executed in 1924, on which there remained a balance due of $21,305, and became the purchaser for $2,500, leaving a large deficit and obliterating the second mortgage of $10,000 on that property, dating from 1927, held by the Rayne State Bank. Mr. Lozen Leger, surety on the Administrator's bond, later purchased this farm.

Authority to sell the only remaining piece of immovable property, the home place at Crowley, was granted by the Court on March 3, 1938, the proceeds to be used to "pay privileged debts of the deceased and charges of his succession," and after due advertisement was sold at public auction to the highest bidder—the attorney for the estate—for $2,335.

The opponent, charging the Administrator with misuse of funds, negligence, sham and subterfuge, claims that he engaged in adventurous crop operations in 1930 and 1931, thus exploiting the estate with the hope of personal gain and eventually to its entire dissipation. His course of conduct from the time of obtaining a reduction of his administrator's bond upon alleged misrepresentations of fact and illusory promises, to the time of filing his account under compulsion, is said to have been a

series of illegal ventures confected with fraudulent intent and accomplished by abuse of a credulous court. She points to his failure to render annual accounts, to his disbursement of funds without presenting a list of the debts and a tableau for homologation, including the payment to himself of $50 a month as salary for managing the farms, as evidences of maladministration, and submits that the peculiar circumstance that an estate valued at $79,137.57 in 1930 had shrunk to a residual of only $3.65 in 1938, taken in connection with the fact that the South Crowley property found its way into the hands of the attorney for the succession and the Acadia Parish farm became the property of the bondsman, plainly indicate collusion, conspiracy and exploitation on the part of the Administrator, his bondsman, and the attorney. The full penalties of Article 1150 of the LSA–Civil Code are invoked, particularly the provisions that administrators "shall on no account withdraw the deposits * * * until a tableau of distribution shall be homologated," and "On failure to comply * *. * they shall be condemned jointly and severally with their securities to pay to the use of the estate twenty per cent. interest per annum on the amount * * * withdrawn without authority, besides all special damage suffered * * *." She presses her claim to $23,847.68, plus 10% interest thereon, said to be the value of property unaccounted for and which must be returned to the succession, as well as to 20% per annum on $12,056.47, representing funds disbursed

without order of court, and seeks to have the fees of the attorney declared excessive.

■ The record contains not one scintilla of evidence to support charges of fraud, collusion, and mismanagement of funds; on the contrary, there is convincing proof that this administrator, a man without the benefit of formal education, acted in utmost good faith and to the best of his ability under the circumstances in which he found himself. That there were irregularities is not denied, since the Administrator failed to file a tableau of proposed expenditures and seek homologation thereof before making payments; however, in the opinion of the trial judge, such debts were honest debts of the estate, and there were no such irregularities as would justify the infliction of the penalties prayed for by the opponent.

It appears from the record that the Administrator was assisted throughout his administration by officials of the Rayne State Bank. His check book and Administrator's Bank Book were left at the bank; when rice and cotton were received as rent, they were sold by the Administrator and the weight sheets plus the check in payment were taken to the bank for entry to his account; when money was to be expended, an official of the bank drew the check, indicating thereon its purpose. The opponent, in excluding this documentary evidence from the transcript for appeal, stated: "It is not contested or denied by said opponent that said amounts reflected by said documents were either received or paid out by said administrator and are reflected correctly in more concise form in his final tableau filed herein." The final tableau shows receipts to the end of 1931 of $11,996.62—which included money borrowed, proceeds from sale of movable property, from rice and cotton crops, and rents from South Crowley property and the Rayne warehouse; and itemized expenditures, including labor and materials for operating the irrigation plants, repairs to the property, repayment of amounts borrowed, taxes, interest on mortgages and an installment to the Federal Land Bank, totaling $11,992.97, leaving a balance in bank at the end of 1931 of $3.65. After the foreclosures in early 1932, the only property left to the estate was the South Crowley place consisting of lots and the house, the rent of which was not sufficient to pay the taxes. The proceeds from the sale of this property in 1938, $2,335, together with the rent which had been collected thereon prior to sale, $145, were used in part to pay city taxes and court costs, the balance being retained in the hands of the purchaser, the attorney for the estate, to satisfy his rights under subrogation for taxes he had paid and to apply to his lien for attorney's fees of $1,911.37. The remainder of the movable property had long since been divided among the heirs, of which the opponent is said by the Administrator to have received her share; she did not take the witness stand to contradict his statement. The Administrator never collected any part of the commission due as administrator; he

did collect $50 a month for the services he rendered in supervising the operations of the two farms before foreclosure, which this Court considers not unreasonable.

We are therefore in full accord with the trial judge's conclusion that this case is not one in which the penalties provided in Article 1150 of the LSA–Civil Code should be inflicted. Under our jurisprudence, the imposition of penalties because of the acts of an administrator in disbursing funds of the succession without proper court order, and in tardily accounting, lies within the sound discretion of the court, and where it is found that the faults of the administrator do not amount to malfeasance, but result, rather, from honest errors of judgment, we will not disturb these findings. See Succession of David, 213 La. 707, 35 So.2d 465, and cases cited therein.

For the reasons assigned, the judgment appealed from is affirmed.